## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THE RIGHT TO BEAR FARMS LLC   )
SILLY GOOSE PRODUCTIONS LTD,   )
          Plaintiffs,   )
          )
v.           )    Case No. _____
          )
DEGRENIER CONTRACTING AND   )
PROPERTY MANAGEMENT LLC,   )
CHAD DEGRENIER, & CARIN   )
DEGRENIER,   )
          Defendants.   )

## COMPLAINT

NOW COME Plaintiffs The Right to Bear Farms LLC and Silly Goose Productions LTD, by and through their attorneys, Downs Rachlin Martin PLLC, and hereby complain against Defendants DeGrenier Contracting and Property Management LLC, Chad DeGrenier, and Carin DeGrenier as follows:

### Parties

1.      Plaintiff The Right to Bear Farms LLC is a Delaware limited liability company whose registered agent is The Corporation Trust Company, located at 1209 Orange Street in Wilmington, Delaware.  As a single-member LLC, The Right to Bear Farms LLC is controlled solely by a revocable trust whose sole trustee is Susan Sarandon.

2.      Plaintiff Silly Goose Productions LTD is a New York business corporation whose registered agent is CT Corporation System, located at 28 Liberty Street in New York, New York.

3.      Defendant DeGrenier Contracting and Property Management LLC is a Massachusetts limited liability company whose registered agent and manager is Defendant Chad DeGrenier.

4.      Defendant Chad DeGrenier lives at 654 River Road in Clarksburg, Massachusetts.

5.      Defendant Carin DeGrenier is married to Chad DeGrenier and performs invoicing, accounting, and record-keeping services for DeGrenier Contracting and Property Management LLC.  Defendant Carin DeGrenier lives at 654 River Road in Clarksburg, Massachusetts.

**<u>Jurisdiction</u>**

6.      Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over the claims in this matter because it is between citizens of different States and the amount in controversy exceeds $75,000.

7.      Additionally, this Court has jurisdiction over those claims in this matter that pertain to the Construction Management Agreement entered into by Silly Goose Productions LTD and DeGrenier Contracting and Property Management LLC because that Construction Management Agreement states that "any lawsuit or proceeding regarding or relating to an unresolved dispute between the parties, regardless of whether there are other parties to the dispute, shall be commenced and filed in the state or federal court located in Berkshire County, in the Commonwealth of Massachusetts."

8.      Additionally, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over those claims in this matter that pertain to the Caretaker Agreement entered into by The Right to Bear Farms LLC and DeGrenier Contracting and Property Management LLC because those claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

Downs
Rachlin
Martin PLLC

**Facts**

9.      In 2018, through The Right to Bear Farms LLC, Ms. Sarandon purchased the

property located at 1040 County Road in Stamford, Vermont (the "Stamford Residence"

property) from Robert Moulton, Jr.  Pursuant to that sale, Mr. Moulton conveyed the Stamford

Residence property to The Right to Bear Farms LLC by warranty deed dated June 1, 2018.

10.      The Stamford Residence property consists of roughly 45 wooded and meadowed

acres, including a hilltop portion overlooking the Hoosac Range in Western Massachusetts.  At

the time that The Right to Bear Farms LLC purchased the Stamford Residence property, that

property was entirely undeveloped except for a small cabin located on it.

11.      When she purchased the Stamford Residence property through The Right to Bear

Farms LLC, Ms. Sarandon had a clear vision for the property's use.  Specifically, in light of

increasing global environmental instability, Ms. Sarandon envisioned constructing a single-

family home (the "Stamford Residence") on the property.  Ms. Sarandon envisioned that the

Stamford Residence would serve as a haven for herself, her children, and her grandchildren, and

that it would function as a second home for her family and eventually as a primary home for

herself.

12.      To that end, Ms. Sarandon envisioned that the Stamford Residence would not

only have capacity for herself, her family, and occasional visitors, but also would provide the

comforts and dependability of a permanent home.  Moreover, it would be sustainable; as Ms.

Sarandon envisioned, the Stamford Residence would ideally be entirely off-the-grid, where she

and her family could grow their own food, utilize solar panels for electricity, utilize water from

the property's well, and rely solely on geothermal energy for heating and cooling.

Downs
Rachlin
Martin PLLC

13.     In furtherance of this sustainability objective, Ms. Sarandon envisioned that the Stamford Residence would make substantial use of corten steel (also known as COR-TEN or weathering steel), including using corten steel for its roof and exterior siding.

14.     As she entered retirement and relocated permanently to the Stamford Residence, Ms. Sarandon envisioned that she would become involved in the local community, where she already had friends and where she anticipated eventually teaching theater to children at a local school.

15.     In addition to costs associated with purchasing the undeveloped property, clearing and leveling of the homesite, and pouring of the foundation's concrete, Ms. Sarandon's budget for construction of the Stamford Residence was $2,000,000.  To finance that construction, Ms. Sarandon would have to sell her New York City apartment, where she had lived for roughly twenty-five years and had raised her three children.

16.     In September 2018, Ms. Sarandon retained Kevin Walz of Walzworkinc to design the Stamford Residence.

17.     Upon Mr. Walz's recommendation, through Silly Goose Productions LTD, Ms. Sarandon retained Chad DeGrenier of DeGrenier Contracting and Property Management LLC to serve as construction manager for the Stamford Residence.

18.     Prior to Ms. Sarandon's signing of the Construction Management Agreement, Mr. DeGrenier represented to Ms. Sarandon that he was qualified to manage the construction of a home like the Stamford Residence and that he had extensive experience in both remodelling and constructing single-family homes in the Stamford, Vermont area, including managing the construction of multiple single-family homes like the Stamford Residence.

Downs
Rachlin
Martin PLLC

19.     Based on these representations, through Silly Goose Productions LTD, Ms. Sarandon signed a Construction Management Agreement with DeGrenier Contracting and Property Management LLC on October 16, 2018.

20.     Nevertheless, DeGrenier Contracting and Property Management LLC was not organized as a limited liability company until December 4, 2018.

21.     The Construction Management Agreement imposed several construction-related obligations on Mr. DeGrenier as construction manager, including to (1) on the basis of their qualifications and ability to perform the requisite work in an efficient manner, select qualified, independent contractors who would construct or install specific portions of the home after consultation with and approval from Ms. Sarandon and her staff; (2) manage those contractors to ensure that their work would be performed in a workmanlike manner and without defects; (3) advise and make recommendations to Ms. Sarandon and her staff regarding progress on the construction process; (4) manage any necessary corrections to work performed by contractors; and (5) ensure that construction of the Stamford Residence would ultimately be fully completed such that it would be suitable for habitation as a permanent home.

22.     The Construction Management Agreement also imposed several invoicing, accounting, and record-keeping-related obligations on Mr. DeGrenier as construction manager, including to (1) maintain all accounting records pertaining to work performed; (2) collect and transmit invoices from contractors to Ms. Sarandon and her staff; (3) ensure the proper payment of contractors; and (4) upon completion of all work or termination of the Construction Management Agreement, provide all documentation prepared, collected, or transmitted in the course of the construction process to Ms. Sarandon and her staff.

5

Downs
Rachlin
Martin PLLC

23.     Upon information and belief, because of her responsibility for performing invoicing, accounting, and record-keeping services for DeGrenier Contracting and Property Management LLC, Carin DeGrenier had responsibility for the above-described invoicing, accounting, and record-keeping-related obligations.

24.     Pursuant to the Construction Management Agreement, Mr. DeGrenier reiterated his prior representation that he was qualified to manage the construction of a home like the Stamford Residence by specifically representing that he was "fully experienced and properly qualified to perform the Services as provided under this Agreement":

> CM represents that it is fully experienced and properly qualified to perform the Services as provided under this Agreement and that it is, and will remain for the duration of this Agreement, properly permitted, licensed, equipped, organized and financed as is necessary to perform such Services.

Construction Management Agreement, Article III.

25.     Pursuant to the Construction Management Agreement, Mr. DeGrenier acknowledged that Ms. Sarandon and her staff would be relying on his experience, expertise, and professionalism in his performance of his obligations as construction manager:

> CM is hereby given notice that Owner will be relying upon the accuracy, competence, and completeness of CM's services.

Construction Management Agreement, Article III.

26.     Also upon Mr. Walz's recommendation, through The Right to Bear Farms LLC, Ms. Sarandon retained John Carnett of Cubist Engineering LLC to serve as a construction consultant.  Specifically, Mr. Walz recommended Mr. Carnett due to his experience working with corten steel.

6

Downs
Rachlin
Martin PLLC

27.     Through The Right to Bear Farms LLC, Ms. Sarandon signed a contract with Cubist Engineering LLC for Mr. Carnett's construction consultant work on January 4, 2019.

28.     When it became clear that the design work completed by Mr. Walz would greatly exceed Ms. Sarandon's $2,000,000 budget for construction of the Stamford Residence, those designs were entirely abandoned.  Instead of proceeding with Mr. Walz's designs or services, Mr. Carnett became responsible for designing the Stamford Residence, with general direction and input from Ms. Sarandon.

29.     The designs developed by Mr. Carnett were less complex than those developed by Mr. Walz.  In general terms, they envisioned the Stamford Residence as a rectangular single-story main portion with an additional three-story tower portion.  The main portion would consist of a great room surrounded by sliding glass doors—which would serve as the foyer, kitchen, dining room, and living area—as well as a children's bunkroom, two guest bedrooms, and a primary bedroom, all connected to the great room by a hallway running along the side of the main portion.  The tower portion would consist of a first floor mechanical and laundry room, a second floor screening room, and a third floor family room surrounded by windows and offering views of the surrounding landscape.

30.     Consistent with Mr. Carnett's experience working with corten steel and Ms. Sarandon's reason for retaining him as a construction consultant, the designs developed by Mr. Carnett made substantial use of corten steel, including using corten steel for the Stamford Residence's roof and exterior siding.

Downs
Rachlin
Martin PLLC

31.     Following completion of the designs for the Stamford Residence, as well as clearing and leveling of the homesite, Mr. DeGrenier managed work on the home beginning in or around October 2019.

32.     To stay informed about the construction process, throughout that process, Ms. Sarandon and her staff would regularly be in communication with Mr. DeGrenier by phone, text message, and email.

33.     Additionally, Ms. Sarandon and her staff would regularly visit the Stamford Residence property every few months to observe progress on the construction process, increasing their visits as construction neared completion.

34.     In or around October 2019, Mr. DeGrenier managed preliminary work on the home's foundation.

35.     Following delays occasioned by the coronavirus pandemic, in or around October 2020, Mr. DeGrenier managed the pouring of the foundation's concrete.

36.     Through 2021 and 2022, Mr. DeGrenier continued to manage construction of the Stamford Residence.

37.     During this period, Mr. Carnett continued to provide construction consulting services, including regarding his designs for the Stamford Residence.  Additionally, Mr. Carnett did construction and installation work on specific portions of the home.

38.     In 2021, Mr. DeGrenier recommended that the corten steel envisioned for the Stamford Residence's roof be replaced with a wooden structure with asphalt shingles.

39.     According to Mr. DeGrenier, he recommended this change to allow for the placement of solar panels on the roof rather than in a meadow on the property.

Downs
Rachlin
Martin PLLC

40.     On this basis—and relying on Mr. DeGrenier's experience, expertise, and professionalism, as contemplated by the Construction Management Agreement—Ms. Sarandon accepted his recommendation and approved the design change.

41.     Shortly after this design change, Mr. DeGrenier additionally recommended that the corten steel envisioned for the Stamford Residence's exterior siding be replaced with wood paneling.

42.     According to Mr. DeGrenier, he recommended this change solely to reduce construction cost.

43.     On this basis—and again relying on Mr. DeGrenier's experience, expertise, and professionalism, as contemplated by the Construction Management Agreement—Ms. Sarandon accepted his recommendation and approved the design change.

44.     As a result of these two design changes, no corten steel would be used in the construction of the Stamford Residence.

45.     Because his experience working with corten steel was no longer necessary and because his new ideas for construction of the home did not align with Ms. Sarandon's vision, in January 2022, Mr. Carnett ceased working on the Stamford Residence.

46.     Throughout the construction process, Mr. and Mrs. DeGrenier were inconsistent in their invoicing, accounting, and record-keeping practices.  Frequently, rather transmitting original invoices from contractors to Ms. Sarandon and her staff, they developed and transmitted invoices on DeGrenier Contracting and Property Management LLC's own letterhead, ostensibly reflecting the work performed and the cost for that work, but without any means for Ms. Sarandon and her staff to verify whether that work had actually been performed, whether

9

Downs
Rachlin
Martin PLLC

DeGrenier Contracting and Property Management LLC's invoices reflected the actual cost for that work, or whether the selected contractors were qualified to perform such work.

47.     These invoicing inconsistencies increased during the latter stages of the construction process.

48.     Upon information and belief, in summer 2022, without permission, Mr. DeGrenier took paint and cypress wood paneling from the Stamford Residence for use at his or his mother's house.

49.     As substantial construction of the Stamford Residence wrapped up in summer 2022, with Mr. DeGrenier's approval, Ms. Sarandon began moving her furniture, artwork, and personal effects to the home in order to prepare it for use as second home for her family, and eventually as a primary home for herself.

50.     Around the same time, Mr. DeGrenier recommended that, after completion of that construction, he continue to work at the property as its caretaker.

51.     To that end, in summer 2022, Mr. DeGrenier transmitted a proposed Caretaker Agreement to Ms. Sarandon's staff.

52.     That proposed Caretaker Agreement listed numerous items that did not even exist at the Stamford Residence property: among other items, the property contained no underbrush requiring clearing and no greenhouse.  Accordingly, Ms. Sarandon declined the Caretaker Agreement.

53.     Despite Ms. Sarandon declining the Caretaker Agreement, in October 2022, her staff nevertheless signed that agreement on her behalf.

Downs
Rachlin
Martin PLLC

54.     Pursuant to the Caretaker Agreement, Mr. DeGrenier was eventually paid $125,000 as an initial down payment for work, as well as $7,142.85 per month for two months of caretaking work at the property.

55.     Roughly one month after Ms. Sarandon's staff signed the Caretaker Agreement on her behalf, in November 2022, Ms. Sarandon and her family spent Thanksgiving at the Stamford Residence.  During that visit, they observed a number of issues with construction completion and quality.

56.     Despite Ms. Sarandon and her staff's practice of maintaining regular communication with Mr. DeGrenier by phone, text message, and email, as well as of regularly visiting the Stamford Residence property throughout the construction process, the issues with construction completion and quality were not observable until Ms. Sarandon moved into the home.

57.     Ms. Sarandon immediately brought these issues to Mr. DeGrenier's attention, but he did not correct them sufficiently or properly and did not engage proper professionals to do so. Instead, he largely downplayed the issues and falsely stated that they were normal and to be expected, or otherwise did not require completion or correction.

58.     Additionally, in response to the issues at the home, Ms. Sarandon requested that Mr. DeGrenier compile and transmit a punch list of outstanding items that required completion or correction, but he did not compile or transmit that punch list.

59.     In January 2023, Ms. Sarandon and her friends again spent considerable time at the Stamford Residence.  During that visit, they observed even more issues with construction completion and quality.

Downs
Rachlin
Martin PLLC

60.     Ms. Sarandon again immediately brought these issues to Mr. DeGrenier's attention, but he again did not correct them sufficiently or properly and did not engage proper professionals to do so.  Instead, he again largely downplayed the issues and falsely stated that they were normal and to be expected, or otherwise did not require completion or correction.

61.     Additionally, Ms. Sarandon again requested that Mr. DeGrenier compile and transmit a punch list of outstanding items that required completion or correction, but he again did not compile or transmit that punch list.

62.     Through the late 2022 period, Mr. DeGrenier visited the Stamford Residence property several times but without clarifying whether he was doing so pursuant to the Construction Management Agreement or to the Caretaker Agreement and without sufficiently or properly correcting the issues with construction completion and quality.

63.     Moreover, Mr. DeGrenier frequently charged Ms. Sarandon $100 per visit, without explaining what work—if any—he performed during those visits.

64.     In response to the issues at the home and Mr. DeGrenier's failure to correct them sufficiently or properly, in February 2023, Ms. Sarandon retained engineers to conduct an engineering investigative report.

65.     Both that engineering investigative report and further observations by Ms. Sarandon, her staff, and independent contractors have revealed numerous issues at the home that require completion or correction, including:

Exterior

(1)     Buckled siding in multiple portions of the exterior.

(2)     Lack of furring strips or air cavity between wood paneling and wall sheathing.

12

Downs
Rachlin
Martin PLLC

(3)     Cracked trim around at least one window.

(4)     Lack of flashing over several exterior windows.

(5)     Improperly executed joints in trim and siding.

(6)     Gaps in siding.

(7)     Poor caulking around exterior doors.

(8)     Lack of trim beneath exterior windows and exterior door
        thresholds.

(9)     Over-nailed exterior wood paneling, including nailing done
        after painting.

(10)    Poorly finished soffit trim above the left exterior patio.

(11)    Cracked foundation around porch supports.

(12)    Exposed outdoor pipes that have not been finished but
        instead have been covered with a bag and cups from
        McDonalds.

(13)    Mold developing on the exterior overhang by the porch.

(14)    Unfinished base portions of gutters that are either entirely
        exposed or covered with a rock.

Primary Bedroom

(15)    Unfinished ceiling at primary bedroom.

(16)    Loose trim at exterior windows, including at the primary
        bedroom window.

(17)    Unfinished trim beneath sill at the primary bedroom
        window.

(18)    Gaps in trim at the bedroom ceiling.

(19)    Poorly finished ceiling around the closet light.

13

(20)    Gaps at exterior doors.

Great Room

(21)    Front door that does not open all the way due to getting
        stuck on concrete floor.

(22)    Unfinished ceiling and cupped ceiling boards.

(23)    Loose, damaged, and marked ceiling boards in the living
        room.

(24)    Lack of priming or paint on the steel beams used in the
        living room.

Roof and Insulation

(25)    Numerous issues with the roof, including an improperly
        supported ridge beam, separation of studs beneath the ridge
        beam, and separation of laminated veneer lumber at the
        ridge beam.

(26)    Poor, insufficient, improperly, or inconsistently installed
        insulation throughout the home, including uninsulated
        portions of roof viewable from the attic, resulting in
        improper functioning and suitability of the geothermal
        energy system and solar panels and necessitating the
        purchase of liquid propane to maintain proper heating in
        the home.

(27)    Missing insulation, such as spray foam, around the area of
        the roof through which the solar panels were installed,
        resulting in holes or gaps leading directly from the attic to
        the exterior.

(28)    Ice damming on multiple portions of the roof, indicating
        poor and/or inconsistent roof insulation.

(29)    Consistently high temperature in the home, indicating
        poorly insulated or vented roof.

(30)    Shingles that are warping and buckling, either due to
        unworkmanlike installation, lack of appropriateness for a
        home of this nature, or a combination thereof.

Downs
Rachlin
Martin PLLC

(31)   Failure to properly overhang shingles, particularly on roof of tower portion.

Tower

(32)   Exterior door to the mechanical and laundry room that does not open or close properly.

(33)   Loose, gapped, buckling, and cupped wall finishes in the tower portion of the home.

(34)   Missing, poorly finished, gapped, or improperly installed trim in the tower, including trim that blocks the awning feature.

(35)   Loose ceiling boards in the tower.

Miscellaneous

(36)   Sheetrock extending into the shower area in the bunkroom bathroom.

(37)   Cracking in sheetrock in the living room.

(38)   Unpainted interior doors.

(39)   Unfinished and exposed—and therefore potentially unsafe—electrical wiring in multiple portions of the home.

(40)   Electrical panel without labeling, unfinished circuits, incorrect and unsafe breakers, and open wiring left unfinished beneath the panel.

(41)   No gate to the property, even though Ms. Sarandon paid for one.

(42)   Insufficient and inadequate air conditioning system, causing heat and humidity problems.

(43)   Insufficient reliance on geothermal energy for heating and cooling.

15

Downs
Rachlin
Martin PLLC

(44)   Sliding doors throughout the home requiring far more force to open than should be necessary.

(45)   Screen to the patio area sliding doors that does not close all the way.

(46)   Patio sliding doors that have a gap between them when closed.

(47)   Poorly secured and inconsistently installed sliding door handles.

66.   Pursuant to the Construction Management Agreement, it was Mr. DeGrenier's responsibility to ensure that these items were constructed or installed in a workmanlike manner.

67.   Upon information and belief, many of these construction defects are due to Mr. DeGrenier's consistent failure to select and manage qualified, independent contractors, and his practice of selecting friends and family members to construct or install specific portions of the home, as well as due to his failure to properly manage those contractors that he did select.

68.   Also upon information and belief, Mr. DeGrenier made many recommendations not on the basis of making decisions in accordance with Ms. Sarandon's vision for the Stamford Residence but instead to suit the abilities of his lesser-qualified friends and family members or because of his lack of qualifications to manage the construction of a home like the Stamford Residence.

69.   Such recommendations included, but were not limited to, Mr. DeGrenier's recommendations to replace the corten steel envisioned for the Stamford Residence's roof with a wooden structure with asphalt shingles and to replace the corten steel envisioned for the home's exterior siding with wood paneling.

16

Downs
Rachlin
Martin PLLC

70.     Also upon information and belief, other of the construction defects are due to Mr. DeGrenier's failure to use proper materials in the construction of the Stamford Residence.

71.     At roughly the same time that these construction defects became apparent in early 2023, inconsistencies in Mr. and Mrs. DeGrenier's invoicing, accounting, and record-keeping practices also became apparent.

72.     More specifically, on November 10, 2022, Ms. Sarandon sent Mr. and Mrs. DeGrenier an advance of $150,000 for the limited purpose of pond excavation.  Since Mr. and Mrs. DeGrenier's receipt of that advance, they have paid out $75,000 to Norm D. Excavating, which should leave $75,000 remaining.  However, according to Norm D. Excavating, despite its requests to be paid for additional pond excavation work, Mr. and Mrs. DeGrenier claim that there are insufficient funds.  Moreover, in their invoices to Ms. Sarandon and her staff, it appears that Mr. and Mrs. DeGrenier have labelled the advance as being for just $100,000.

73.     Additionally, it eventually became apparent that Mr. and Mrs. DeGrenier's practice of developing and transmitting invoices on DeGrenier Contracting and Property Management LLC's own letterhead was no longer accurately reflecting the work performed by contractors and the cost for that work.

74.     In particular, in January 2023, Mr. and Mrs. DeGrenier transmitted an invoice to Ms. Sarandon and her staff for tree removal work performed by Norm D. Excavating and tree planting work performed by James Sutton.  When Ms. Sarandon and her staff followed up directly with those contractors, they informed Ms. Sarandon and her staff that the cost of their work was significantly less than reflected in the invoice prepared by Mr. and Mrs. DeGrenier.

17

75.     Vagueness and lack of specificity in other invoices developed and transmitted by Mr. and Mrs. DeGrenier indicate that similar discrepancies may also exist between the costs charged by Mr. and Mrs. DeGrenier and the actual costs charged by contractors.

76.     For many of the contractors who have contributed to work at the Stamford Residence, Mr. and Mrs. DeGrenier claimed to have paid them, but without providing checks or invoices for those payments and without obtaining approval from Ms. Sarandon or her staff beforehand.

77.     Accordingly, upon information and belief, throughout the construction process, Mr. and Mrs. DeGrenier may have been inflating invoices to secure higher payments to themselves, without then sufficiently or properly passing necessary payments on to contractors, and may have been charging Ms. Sarandon for items that were never installed or constructed at the Stamford Residence.

78.     In light of these invoicing, accounting, and record-keeping concerns, pursuant to the Construction Management Agreement, Ms. Sarandon has repeatedly requested invoices for labor, materials, and services; accounting of all time and materials that Mr. DeGrenier charged; all written proposals, estimates, proposed change orders, and approved change orders that he received; all other documentation that he relied on in preparing invoices; all written warranties, manuals, technical specifications and bulletins for all of the appliances and mechanical and electrical components incorporated into the home; the Certification of Compliance with the Vermont Residential Building Energy Standards; and all as-built drawings, sketches, plans, and other documents evidencing how the home was actually constructed.

18

Downs
Rachlin
Martin PLLC

79.     Such documents have been requested to determine what materials were used in the construction or installation of specific portions of the home, as well as to verify whether work had actually been performed, whether the invoices transmitted to Ms. Sarandon reflected the actual cost for that work, and whether the selected contractors were qualified to perform such work.

80.     Mr. and Mrs. DeGrenier have repeatedly failed to transmit the requested documents to Ms. Sarandon.

81.     Accordingly, Mr. DeGrenier's work at the Stamford Residence pursuant to the Construction Management Agreement is faulty for two primary reasons: (1) construction defects throughout the home, and (2) improper invoicing, accounting, and record-keeping practices.

82.     The construction defects at the Stamford Residence are unaesthetic, cause inconvenience and physical discomfort, degrade residents' and visitors' enjoyment of the home, will lead to structural problems at the Stamford Residence, and in many cases raise potential safety concerns for occupants.

83.     Moreover, given that so much of the home was constructed in an unworkmanlike manner or otherwise not to the requested specifications, it is highly likely that other conditions—including perhaps even more concerning conditions—will come to light.

84.     Correction of the extensive problems at the Stamford Residence will require significant expenditures, as many items or portions of the home will have to be removed and reinstalled or reconstructed entirely from scratch.  Ms. Sarandon will have to remove her furniture, artwork, and personal effects, and she will not be able to use the home for an extended period of time.

Downs
Rachlin
Martin PLLC

85.     Since observing the issues with construction completion and quality, Ms. Sarandon has learned that, prior to her signing of the Construction Management Agreement, Mr. DeGrenier misrepresented to her that he was qualified to manage the construction of a home like the Stamford Residence.  Upon information and belief, contrary to his representations to Ms. Sarandon, he does not have extensive experience in managing the construction of multiple single-family homes like the Stamford Residence.

86.     Meanwhile, Mr. DeGrenier's failure to provide documentation and a punch list, explain numerous expenses, or account for funds that were advanced to him make it impossible for Ms. Sarandon and her staff to fully determine the entire scope of work performed, whether contractors or vendors were properly retained or paid, or whether payments that were made were reasonable or instead inflated.

87.     Despite Ms. Sarandon and her staff raising these issues with Mr. DeGrenier numerous times throughout late 2022 and early 2023, Mr. DeGrenier has consistently ignored her concerns regarding construction defects throughout the home and improper invoicing, accounting, and record-keeping practices.

88.     Additionally, Mr. DeGrenier has failed to engage in the dispute resolution provisions of the Construction Management Agreement.

89.     Pursuant to those dispute resolution provisions, counsel for Plaintiffs requested a meeting with Mr. DeGrenier by April 25, 2023, to engage in a good-faith settlement attempt aimed at resolving all concerns with the Stamford Residence.  Without explanation, Mr. DeGrenier did not engage in those settlement attempts and therefore has waived those dispute resolution provisions.

20

90.     On May 12, 2023, pursuant to Massachusetts General Laws, Chapter 93A, Section 9, counsel for Plaintiffs sent a demand letter to DeGrenier Contracting and Property Management LLC describing the above-described issues.  Mr. DeGrenier has failed to provide an offer of settlement, to correct the construction defects, or to correct his and Mrs. DeGrenier's improper invoicing, accounting, and record-keeping practices.

91.     Additionally, Mr. DeGrenier's work at the Stamford Residence pursuant to the Caretaker Agreement is faulty.  Upon information and belief, despite receiving nearly $140,000 pursuant to the Caretaker Agreement, Mr. DeGrenier has performed essentially no work pursuant to that agreement.

92.     Instead, upon information and belief, Mr. DeGrenier used roughly $91,000 of the money received pursuant to the Caretaker Agreement to purchase a snowblower and register it in his name.

93.     After repeated questioning about his work—or lack thereof—pursuant to the Caretaker Agreement, in April 2023, Mr. DeGrenier rescinded that agreement.

94.     Nevertheless, despite rescinding that agreement, Mr. DeGrenier has failed to explain what work—if any—he performed pursuant to the Caretaker Agreement or to return the amounts given to him pursuant to that agreement.

## Count I: Breach of Contract – Construction Management Agreement

95.     Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

Downs
Rachlin
Martin PLLC

96.     Pursuant to the Construction Management Agreement, Defendants had numerous construction-related obligations and numerous invoicing, accounting, and record-keeping-related obligations concerning the Stamford Residence.

97.     As previously described, Defendants failed to (1) on the basis of their qualifications and ability to perform the requisite work in an efficient manner, select qualified, independent contractors who would construct or install specific portions of the home after consultation with and approval from Ms. Sarandon and her staff; (2) manage those contractors to ensure that their work would be performed in a workmanlike manner and without defects; (3) advise and make recommendations to Ms. Sarandon and her staff regarding progress on the construction process; (4) manage any necessary corrections to work performed by contractors; and (5) ensure that construction of the Stamford Residence would ultimately be fully completed such that it would be suitable for habitation as a permanent home.

98.     Also as previously described, Defendants failed to (1) maintain all accounting records pertaining to work performed; (2) collect and transmit invoices from contractors to Ms. Sarandon and her staff; (3) ensure the proper payment of contractors; and (4) upon completion of all work or termination of the Construction Management Agreement, provide all documentation prepared, collected, or transmitted in the course of the construction process to Ms. Sarandon and her staff.

99.     Defendants' failure to adhere to their contractual obligations has caused extensive damages to Plaintiffs, including requiring significant expenditures to complete or correct numerous items and portions of the Stamford Residence; removal of furniture, artwork, and personal effects from the home; and preventing use of the home for an extended period of time.

Downs
Rachlin
Martin PLLC

100.     Additionally, due to Defendants' failure to adhere to their contractual obligations regarding invoicing, accounting, and record-keeping, Ms. Sarandon is unable to fully confirm the extent to which Defendants were inflating invoices to secure higher payments to themselves, without then sufficiently or properly passing necessary payments on to contractors, and charging her for items that were never installed or constructed at the Stamford Residence.

101.     Accordingly, Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' breach of contract concerning the Construction Management Agreement.

## Count II: Breach of Implied Warranties of Merchantability and Workmanship – Construction Management Agreement

102.     Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

103.     The Construction Management Agreement contains implied warranties of merchantability and workmanship.

104.     Despite these implied warranties of merchantability and workmanship, Defendants managed the construction of the Stamford Residence in such a way that there are numerous defects throughout the home pertaining to construction completion and quality.

105.     Despite Ms. Sarandon and her staff's practice of maintaining regular communication with Mr. DeGrenier by phone, text message, and email, as well as of regularly visiting the Stamford Residence property throughout the construction process, the issues with construction completion and quality were not observable until Ms. Sarandon moved into the home.

Downs
Rachlin
Martin PLLC

106.     Upon information and belief, many of these construction defects are due to Mr. DeGrenier's consistent failure to select and manage qualified, independent contractors, and his practice of selecting friends and family members to construct or install specific portions of the home, as well as due to his failure to properly manage those contractors that he did select.

107.     Also upon information and belief, many of these construction defects are due to Mr. DeGrenier's fundamental misrepresentation to Ms. Sarandon—prior to her signing of the Construction Management Agreement—that he was qualified to manage the construction of a home like the Stamford Residence.

108.     Also upon information and belief, other of the construction defects are due to Mr. DeGrenier's failure to use proper materials in the construction of the Stamford Residence.

109.     Defendants' failure to manage construction of the Stamford Residence in accordance with the implied warranties of merchantability and workmanship has caused extensive damages to Plaintiffs, including requiring significant expenditures to complete or correct numerous items and portions of the Stamford Residence; removal of furniture, artwork, and personal effects from the home; and preventing use of the home for an extended period of time.

110.     Accordingly, Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' breach of the implied warranties of merchantability and workmanship concerning the Construction Management Agreement.

**Count III: Breach of Implied Covenant of Good Faith and Fair Dealing – Construction Management Agreement**

111.     Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

24

Downs
Rachlin
Martin PLLC

112.    The Construction Management Agreement contains an implied covenant of good faith and fair dealing.

113.    As part of the implied covenant of good faith and fair dealing, Defendants were required to deal in good faith with Plaintiffs and were prohibited from undermining or destroying Plaintiffs' rights to receive the benefit of the Construction Management Agreement.

114.    Defendants breached the implied covenant of good faith and fair dealing through their failure to (1) on the basis of their qualifications and ability to perform the requisite work in an efficient manner, select qualified, independent contractors who would construct or install specific portions of the home after consultation with and approval from Ms. Sarandon and her staff; (2) manage those contractors to ensure that their work would be performed in a workmanlike manner and without defects; (3) advise and make recommendations to Ms. Sarandon and her staff regarding progress on the construction process; (4) manage any necessary corrections to work performed by contractors; and (5) ensure that construction of the Stamford Residence would ultimately be fully completed such that it would be suitable for habitation as a permanent home.

115.    Defendants further breached the implied covenant of good faith and fair dealing through their failure to (1) maintain all accounting records pertaining to work performed; (2) collect and transmit invoices from contractors to Ms. Sarandon and her staff; (3) ensure the proper payment of contractors; and (4) upon completion of all work or termination of the Construction Management Agreement, provide all documentation prepared, collected, or transmitted in the course of the construction process to Ms. Sarandon and her staff.

25

116.     In particular, Defendants further breached the implied covenant of good faith and fair dealing through Mr. DeGrenier's practices of selecting friends and family members to construct or install specific portions of the home, making recommendations not on the basis of making decisions in accordance with Ms. Sarandon's vision for the Stamford Residence but instead to suit the abilities of Mr. DeGrenier's lesser-qualified friends and family members or because of his lack of qualifications to manage the construction of a home like the Stamford Residence; and developing and transmitting invoices on DeGrenier Contracting and Property Management LLC's own letterhead and thereby no longer accurately reflecting the work performed by contractors and the cost for that work.

117.     Defendants' failure to manage construction of the Stamford Residence in accordance with the implied covenant of good faith and fair dealing has caused extensive damages to Plaintiffs, including requiring significant expenditures to complete or correct numerous items and portions of the Stamford Residence; removal of furniture, artwork, and personal effects from the home; and preventing use of the home for an extended period of time.

118.     Additionally, due to Defendants' failure to adhere to their contractual obligations regarding invoicing, accounting, and record-keeping, Ms. Sarandon is unable to fully confirm the extent to which Defendants were inflating invoices to secure higher payments to themselves, without then sufficiently or properly passing necessary payments on to contractors, and charging her for items that were never installed or constructed at the Stamford Residence.

119.     Accordingly, Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' breach of the implied covenant of good faith and fair dealing concerning the Construction Management Agreement.

Downs
Rachlin
Martin PLLC

## Count IV: Unjust Enrichment – Construction Management Agreement

120.    Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

121.    Defendants unjustly enriched themselves through their practices of selecting friends and family members to construct or install specific portions of the home, making recommendations not on the basis of making decisions in accordance with Ms. Sarandon's vision for the Stamford Residence but instead to suit the abilities of Mr. DeGrenier's lesser-qualified friends and family members or because of his lack of qualifications to manage the construction of a home like the Stamford Residence; and developing and transmitting invoices on DeGrenier Contracting and Property Management LLC's own letterhead and thereby no longer accurately reflecting the work performed by contractors and the cost for that work.

122.    Additionally, due to Defendants' failure to adhere to their contractual obligations regarding invoicing, accounting, and record-keeping, Ms. Sarandon is unable to fully confirm the extent to which Defendants were inflating invoices to secure higher payments to themselves, without then sufficiently or properly passing necessary payments on to contractors, and charging her for items that were never installed or constructed at the Stamford Residence.

123.    Accordingly, Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' unjust enrichment concerning the Construction Management Agreement.

## Count V: Fraudulent Misrepresentation – Qualifications

124.    Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

Downs
Rachlin
Martin PLLC

125.    To induce Ms. Sarandon to sign the Construction Management Agreement, Defendants knowingly and falsely misrepresented to her that Mr. DeGrenier was qualified to manage the construction of a home like the Stamford Residence.

126.    Upon information and belief, contrary to his representations to Ms. Sarandon, Mr. DeGrenier does not have extensive experience in managing the construction of multiple single-family homes like the Stamford Residence and was not qualified to manage construction of the Stamford Residence.

127.    Ms. Sarandon would not have signed the Construction Management Agreement were it not for the misrepresentations regarding Mr. DeGrenier's qualifications.

128.    Defendants' misrepresentations have caused extensive damages to Plaintiffs, including requiring significant expenditures to complete or correct numerous items and portions of the Stamford Residence; removal of furniture, artwork, and personal effects from the home; and preventing use of the home for an extended period of time.

129.    Accordingly, Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' fraudulent misrepresentations regarding Mr. DeGrenier's qualifications.

**Count VI: Fraudulent Misrepresentation – Invoicing, Accounting, and Record-Keeping Practices**

130.    Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

131.    Upon information and belief, to induce Ms. Sarandon to make inflated or unnecessary payments, throughout the construction process, Defendants knowingly and falsely inflated invoices to secure higher payments to themselves, without then sufficiently or properly

Downs
Rachlin
Martin PLLC

passing necessary payments on to contractors, and knowingly and falsely charged Ms. Sarandon for items that were never installed or constructed at the Stamford Residence.

132.    Ms. Sarandon would not have made such payments were it not for those misrepresentations.

133.    Due to Defendants' failure to adhere to their contractual obligations regarding invoicing, accounting, and record-keeping, Ms. Sarandon is unable to fully confirm the extent to which Defendants were inflating invoices to secure higher payments to themselves, without then sufficiently or properly passing necessary payments on to contractors, and charging her for items that were never installed or constructed at the Stamford Residence.

134.    Accordingly, Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' fraudulent misrepresentations regarding invoicing, accounting, and record-keeping.

**Count VII: Violation of Massachusetts General Laws, Chapter 93A – Construction Management Agreement**

135.    Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

136.    As it pertains to construction of a home for Ms. Sarandon and her family, Plaintiffs entered into that Construction Management Agreement for personal, family, and household purposes.

137.    Through Defendants' intentional, willful, and knowing breach of their contractual obligations to complete work and correct construction defects throughout the home, and to maintain proper invoicing, accounting, and record-keeping practices, Defendants have acted unfairly and deceptively in violation of Massachusetts General Laws, Chapter 93A, Section 9, as

Downs
Rachlin
Martin PLLC

those terms are explicated in Massachusetts case law.  *See, e.g.,* Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991).

138.     On May 12, 2023, pursuant to Massachusetts General Laws, Chapter 93A, Section 9, counsel for Plaintiffs sent a demand letter to DeGrenier Contracting and Property Management LLC describing the above-described issues.

139.     Knowing that their actions causing the construction defects throughout the home and the improper invoicing, accounting, and record-keeping practices have violated Massachusetts General Laws, Chapter 93A, Defendants nevertheless in bad faith have failed to provide an offer of settlement, to correct the construction defects, or to correct their improper invoicing, accounting, and record-keeping practices.

140.     Accordingly, Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' violation of Massachusetts General Laws, Chapter 93A.

## Count VIII: Breach of Contract – Caretaker Agreement

141.     Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

142.     Despite receiving nearly $140,000 pursuant to the Caretaker Agreement, Mr. DeGrenier has performed essentially no work pursuant to that agreement.

143.     Instead, upon information and belief, Mr. DeGrenier used roughly $91,000 of the money received pursuant to the Caretaker Agreement to purchase a snowblower and register it in his name.

144.     Mr. DeGrenier's failure to perform work pursuant to the Caretaker Agreement constitutes a breach of that agreement.

Downs
Rachlin
Martin PLLC

145.     Despite rescinding that agreement, Mr. DeGrenier has failed to explain what work—if any—he performed pursuant to the Caretaker Agreement or to return the amounts given to him pursuant to that agreement.

146.     Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' breach of contract concerning the Caretaker Agreement.

### Count IX: Breach of Implied Covenant of Good Faith and Fair Dealing – Caretaker Agreement

147.     Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

148.     The Caretaker Agreement contains an implied covenant of good faith and fair dealing.

149.     As part of the implied covenant of good faith and fair dealing, Defendants were required to deal in good faith with Plaintiffs and were prohibited from undermining or destroying Plaintiffs' rights to receive the benefit of the Caretaker Agreement.

150.     Defendants breached the implied covenant of good faith and fair dealing through Mr. DeGrenier's failure to perform work pursuant to the Caretaker Agreement or to return the amounts given to him pursuant to that agreement.

151.     Defendants breached the implied covenant of good faith and fair dealing through Mr. DeGrenier's use of roughly $91,000 of the money received pursuant to the Caretaker Agreement to purchase a snowblower and register it in his name.

152.     Accordingly, Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' breach of the implied covenant of good faith and fair dealing concerning the Caretaker Agreement.

Downs
Rachlin
Martin PLLC

## Count X: Unjust Enrichment – Caretaker Agreement

153.   Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

154.   Defendants unjustly enriched themselves through Mr. DeGrenier's failure to perform work pursuant to the Caretaker Agreement, despite receiving nearly $140,000 pursuant to that agreement.

155.   Defendants further unjustly enriched themselves through Mr. DeGrenier's use of roughly $91,000 of the money received pursuant to the Caretaker Agreement to purchase a snowblower and register it in his name.

156.   Accordingly, Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' unjust enrichment concerning the Caretaker Agreement.

## Count XI: Conversion

157.   Plaintiffs repeat and reallege each allegation from the preceding paragraphs as if fully stated herein.

158.   Upon information and belief, in summer 2022, without permission, Mr. DeGrenier took paint and cypress wood paneling from the Stamford Residence for use at his or his mother's house.

159.   Such paint and cypress wood paneling belonged to Plaintiffs, as they were purchased for use in the construction of the Stamford Residence.

160.   Accordingly, Plaintiffs request that this Court award them damages in an amount to be proven at trial for Defendants' conversion of paint and cypress wood paneling from the Stamford Residence.

32

Downs
Rachlin
Martin PLLC

**<u>Request for Jury Trial</u>**

Plaintiffs hereby request jury trial on all issues so triable.

WHEREFORE, Plaintiffs Right to Bear Farms LLC and Silly Goose Productions LTD

hereby request that this Court grant the following relief:

(a)     Enter judgment in their favor on all of the above-described counts;

(b)     Award them damages in an amount to be proven at trial;

(c)     Award them multiple damages, but no less than treble damages and attorneys'
        fees, for Defendants' willful and knowing violations of Massachusetts General
        Laws, Chapter 93A; and

(d)     Grant any further relief that this Court deems just and proper.

Dated at Burlington, Vermont, this 17th day of August, 2023.

DOWNS RACHLIN MARTIN PLLC

By:     */s/ Walter E. Judge*
        Walter E. Judge, Esq.
        Marc B. Heath, Esq. *(application for pro
        hac vice admission to be filed)*
        Christian S. Chorba, Esq. *(application for
        admission to be filed)*
        199 Main Street, P.O. Box 190
        Burlington, VT  05402-0190
        Telephone: (802) 863-2375
        Fax: (802) 862-7512
        wjudge@drm.com
        mheath@drm.com
        cchorba@drm.com

ATTORNEYS FOR PLAINTIFFS

22238800.1

Downs
Rachlin
Martin PLLC